## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LAYLA CAPACI, as Administrator of the Estate of Niki Capaci, Deceased, and on behalf of All Distributees and Next-of-Kin including LAYLA CAPACI, Individually,

                           Plaintiff,

              -against-

CYREL DASRAJ, COUNTY OF ORANGE, TENESHIA WASHINGTON, RN, WELLPATH, LLC as a Nominal Defendant, WELLPATH LIQUIDATING TRUST as a Nominal Defendant, NEW YORK CORRECT CARE SOLUTIONS MEDICAL SERVICES, P.C., and JOHN and JANE DOE #1-10,

                         Defendants.

Civil Action No.:
7:24-cv-4626 (PMH)

**AMENDED COMPLAINT
AND
JURY DEMAND**

---

Plaintiff Layla Capaci, as Administrator of the Estate of Niki Capaci, and on behalf of All Distributees and Next-of-Kin, by and through her attorneys, The Jacob D. Fuchsberg Law Firm, LLP, for her Amended Complaint against Defendants as above captioned, alleges as follows, upon information and belief:

### PRELIMINARY STATEMENT

1.      Decedent Niki Capaci (hereinafter "Ms. Capaci" or "Decedent") was arrested on or about May 3, 2023, for violating the conditions of her probation and was detained at Orange County Correctional Facility (hereinafter "OCCF") soon thereafter. She was 40 years of age at the time.

2.      From the onset of her incarceration at OCCF on May 3, 2023, Ms. Capaci reported a recent history of drug use and exhibited symptoms of opiate withdrawal. Employees of OCCF as well as Wellpath, LLC and New York Correct Care Solutions Medical Services, P.C. (hereinafter

collectively "Wellpath"), the companies contracted by the County of Orange to provide medical care to detainees at OCCF, knew that Ms. Capaci was experiencing symptoms of opiate withdrawal. Defendants failed to provide adequate medical care for Ms. Capaci as they ignored her deteriorating condition, her multiple pleas for medical attention, and the need for constant monitoring and withdrawal management.

3.      Within three days, Ms. Capaci went from being physically able and independent to being found dead in her cell. Ms. Capaci was found unresponsive in her cell at approximately 6:04am on May 6, 2023, and was subsequently declared dead.

4.      Up until her death, Ms. Capaci was inhumanely forced to suffer opiate withdrawal without appropriate medical intervention and supervision to identify, treat, and mitigate her condition. Although Ms. Capaci had a documented intolerance to buprenorphine (also known as "suboxone") as an opioid agonist, and although Ms. Capaci herself explained this intolerance to the Defendants, Defendants negligently and recklessly prescribed buprenorphine to Ms. Capaci, which only exacerbated her symptoms and contributed to her premature death. This was against OCCF's protocols that required having different detoxification mechanisms, including methadone, available for detainees.

5.      In addition, even though OCCF protocols required that detainees experiencing withdrawal be monitored every 15 minutes, Defendants failed to adequately monitor Ms. Capaci throughout her stay, including during the final four (4) hours leading up to her death. Notably, Ms. Capaci presented herself to the Medical Department repeatedly during her three-day stay at Orange County Jail, with increasingly concerning symptoms of opiate withdrawal including but not limited to profuse vomiting, sweating, hallucination, and tremor. Nonetheless, each time, Defendants discharged Ms. Capaci to her jail cell without adequate care. Ms. Capaci was never transferred to

an outside medical facility, even though her dire condition required urgent, heightened care.

6.      As indicated in the autopsy report by Orange County Medical Examiner's Office, Ms. Capaci had elevated levels of drugs including fentanyl in her system. Upon information and belief, complications related to mismanaged withdrawal from these drugs caused Ms. Capaci's death. For *three days*, Defendants failed to provide appropriate medical care to Ms. Capaci to mitigate the effects of her withdrawal, failed in their duty to properly monitor and supervise Ms. Capaci in violation of their own protocols, ignored her escalating symptoms and complaints, and failed to transfer Ms. Capaci to an outside medical facility when her symptoms necessitated an elevation of care. Rather than diagnose or treat her symptoms properly, upon information and belief, Ms. Capaci was taunted by correctional officers at OCCF when requesting medical attention through the intercom in her cell, where she was told, "You're not dying, stop pressing the button."

7.      Upon information and belief, Defendants County of Orange, Wellpath, LLC, and New York Correct Care Solutions Medical Services, P.C. each has an unconstitutional pattern of deliberate indifference towards the medical needs of detainees experiencing drug intoxication and/or withdrawal.

8.      Ms. Capaci experienced unnecessary catastrophic pain and suffering as well as untimely death, due to negligence, carelessness, and deliberate indifference of Wellpath's medical personnel and OCCF's correctional officers. Had Ms. Capaci's complaints been appropriately heeded, and had the Defendants provided her with the necessary medical care to treat and alleviate her symptoms of withdrawal, Ms. Capaci's family, including her seven children, would still have her with them today.

9.      Layla Capaci, sister of Niki Capaci and duly appointed Administrator to her Estate, brings this suit under 42 U.S.C. § 1983 for violations of Ms. Capaci's rights under the Eighth and

the Fourteenth Amendments to the United States Constitution for Defendants' willful withholding of medical care in response to Ms. Capaci's serious medical needs while in OCCF custody. Defendants' egregious and reckless disregard for the Decedent's health and well-being caused her to suffer significant pain and suffering as well as wrongful death while at OCCF. Layla Capaci further brings this suit for negligence and professional malpractice in connection with the deficient medical and nursing care provided to her by each of the Defendants.

10.    Layla Capaci seeks redress for Defendants' unconstitutional and otherwise unlawful conduct, which caused the Decedent, as well as her distributees and next-of-kin including her seven young children, significant injuries, losses, harm, and damages.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon 42 U.S.C. § 1983, authorizing actions to redress deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorney's fees and cost to prevailing plaintiffs in actions under 42 U.S.C. § 1983.

12.    Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 with respect to New York state law claims, as they are related to and constitute part of the same case or controversy as claims based on 42 U.S.C. § 1983.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

14.    Plaintiff Layla Capaci resides at 42 Sneed St., Wurtsboro, NY 12790. She is the

court-appointed administrator to the Estate of Niki Capaci, which includes Niki Capaci's seven children and other surviving next-of-kin.

15.     At all times relevant hereto, Defendant County of Orange (hereinafter "Defendant County") was and is a municipality that is a political subdivision of the State of New York.

16.     At all times relevant hereto, OCCF was and is a carceral institution that is owned, operated, controlled, managed, and/or supervised by Defendant County and Orange County Sheriff's Office (hereinafter "OCSO").

17.     At all times relevant hereto, OCSO was and is a law enforcement agency that was owned and operated by Defendant County.

18.     At all times relevant hereto, Defendant County, acting through OCCF, OCSO, Wellpath, and their respective employees, agents, servants, and contractors, was the municipality responsible for the policy, practice, supervision, implementation, and conduct of all correctional matters and was responsible for the hiring, appointment, training, supervision, and conduct of all corrections personnel, including Defendants Cyrel Dasraj and Teneshia Washington referenced herein. In addition, at all relevant times, the County was responsible for enacting, implementing, and enforcing the rules and protocols of OCCF, and for ensuring that corrections personnel obey the Constitution and laws of the United States.

19.     At all times relevant hereto, Correctional Officers (hereinafter "CO's"), including but not limited to Defendant Cyrel Dasraj (hereinafter "Defendant CO Dasraj"), were employed by OCCF, OCSO, and Defendant County. CO's primary responsibility was and is to maintain effective supervision and to provide care, custody, and control of detainees in the facility. In their capacity as agents, servants, and employees of Defendant County, and within the scope of their employment as such, Defendant CO Dasraj and/or other CO's oversaw, supervised, and/or

monitored incarcerated persons at OCCF, including Ms. Capaci. Defendant CO Dasraj is sued in his official and individual capacities.

20.    At all times relevant hereto, Defendant Wellpath, LLC was and is a "contracted medical vendor" employed by Defendant County to provide medical care to detainees, including Niki Capaci, while incarcerated at OCCF.

21.    Defendant Wellpath, LLC is a foreign limited liability company headquartered in the State of Tennessee and incorporated under the laws of the State of Delaware.

22.    Defendant Wellpath, LLC is a necessary nominal party pursuant to Wellpath's bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

23.    The Wellpath Liquidating Trust is an entity that was created from Wellpath's bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas Houston Division. The Liquidating Trust is named as a nominal defendant pursuant to Plaintiffs' rights under 28 U.S.C. § 157(b)(5) to (1) recover against available third-party insurance proceeds or an unreleased co-defendant, and/or (2) to establish or liquidate the amount of their claim against Defendant Wellpath for distribution under the Bankruptcy Plan from the Liquidating Trust after exhausting the required procedures in the Plan.

24.    At all times relevant hereto, Defendant New York Correct Care Solutions Medical Services, P.C. was and is an entity name created, contracted with, and/or assumed by Defendant Wellpath, LLC to conduct business in New York State. For the factual allegations in this Amended Complaint, Defendant Wellpath, LLC and Defendant New York Correct Care Solutions Medical Services, P.C. are used interchangeably and collectively referred to as Defendant "Wellpath."

25.    At all times relevant hereto, Defendant Wellpath hired, retained, supervised,

6

managed, and controlled health providers who provided medical care to detainees at OCCF. Defendant Wellpath was responsible for the hiring, appointment, training, supervision, and conduct of all such OCCF medical personnel, including Defendant Teneshia Washington. In addition, at all relevant times, Defendant Wellpath was responsible for enacting, implementing, and enforcing the rules and protocols in providing medical care at OCCF, and for ensuring that OCCF health providers obey the Constitution and laws of the United States.

26.     At all times relevant hereto, OCCF medical personnel, including but not limited to Defendant Teneshia Washington, RN, also known as Te'nesia Washington, RN, (hereinafter "Defendant Nurse Washington"), were licensed health providers and "contracted medical vendors" employed by Wellpath and contracted by OCCF, OCSO, and Defendant County. In their capacity as agents, servants, contractors, and/or employees of Defendant County and Defendant Wellpath, and within the scope of their employment as such, Defendant Nurse Washington and/or other OCCF medical personnel monitored, treated, and/or cared for incarcerated persons at OCCF, including Ms. Capaci. Defendant Nurse Washington is sued in her official and individual capacities.

27.     At all times relevant hereto, Defendants John and Jane Doe #1-10, whose actual names are not known to Plaintiff despite reasonable efforts to obtain such information, and who is sued herein by the fictitious designation of "John and Jane Doe", were correctional officers, supervisory officials, and medical personnel in charge of the custodial and medical care provided to Ms. Capaci during relevant times. At all times relevant hereto, John and Jane Doe #1-10 were agents, servants, and employees of Defendant Wellpath and/or Defendant County. With regard to all relevant events, John and Jane Doe #1-10 were acting within the scope of their capacity as agents, servants, and employees of Defendant Wellpath and/or Defendant County.

## JURY DEMAND

28.     Plaintiff hereby demands a trial by jury on all of her claims in this action.

## STATEMENT OF FACTS

29.     On or about May 3, 2023, Decedent Niki Capaci, then 40 years of age, was arrested by the OCSO for violating the terms of her probation.

30.     On or about May 3, 2023, Ms. Capaci was incarcerated at OCCF and was assigned Booking ID # 2023-00812.

31.     On or about May 3, 2023, Ms. Capaci underwent an initial screening, suicide prevention screening, and PREA screening by OCCF CO's and Wellpath personnel. Based on the initial screening, Ms. Capaci was in generally good physical health, with no mobility, respiratory, behavioral, or speech impediments. That said, multiple injection sites were observed on Ms. Capaci's right hip, and Ms. Capaci reported having used heroin earlier that day. As a result, it was determined that Ms. Capaci required Clinical Opiate Withdrawal Scale (hereinafter "COWS") monitoring.

32.     Ms. Capaci was placed in the general population of OCCF in cell # 2 of Unit B. Placement in general population meant that Ms. Capaci's physical condition was not constantly monitored except for when CO's conducted rounds or when Ms. Capaci requested to be taken to the Medical Department. Upon information and belief, the Medical Department within OCCF is a separate unit from the housing compound where detainees such as Ms. Capaci could receive medical care treatment, typically from Wellpath medical personnel.

33.     On May 3, 2023, as of 5:10pm, Ms. Capaci was placed on "Special Watch" by Wellpath personnel and Supervisory Staff, Kaitlin Menard, RN (hereinafter "Supervisory Nurse Menard") at OCCF. In placing Ms. Capaci on Special Watch, Supervisory Nurse Menard

specifically noted that Ms. Capaci must be physically monitored **_every 15 minutes_** for any signs or symptoms of drug withdrawal, including but not limited to sweating, shaking, nausea, vomiting, and speech problems. This requirement is consistent with the standard of care for drug detoxification of individuals in custody.

34.    The Special Watch protocol established by OCSO states that, when a detainee is placed on Special Watch, CO's must observe, look for, and document the detainee's labored breathing, profuse sweating, vomiting, and complaints of pain; and immediately notify the medical personnel if the detainee exhibits any of these symptoms of drug withdrawal. Additionally, CO's should document the detainee's behavior and appearance every 15 minutes in the Behavioral Activity Log in addition to the Housing Unit Log.

35.    On May 3, 2023, between 3:00pm and 11:00pm, OCCF CO Oldfeld and Lt. Campbell were on duty.

36.    Even after Ms. Capaci was placed on "Special Watch" at around 5:10pm, OCCF and Wellpath personnel failed to evaluate Ms. Capaci's condition every 15 minutes as is required by the Special Watch protocol.

37.    Ms. Capaci saw Supervisory Nurse Menard at the Medical Department on May 3, 2023, at or around 6:15pm.

38.    On May 3, 2023, at 6:21pm, Supervisory Nurse Menard reported that Ms. Capaci had a Clinical Institute Withdrawal Assessment of Alcohol (hereinafter "CIWA") score of 0, which would normally indicate no sign of withdrawal; the records designated Ms. Capaci as "not specified."

39.    On May 3, 2023, at 6:23pm, Supervisory Nurse Menard reported that Ms. Capaci had a COWS score of 2, which would normally indicate no sign of withdrawal; the records

designated Ms. Capaci as "not specified."

40.    It appears that during this encounter, Ms. Capaci received her first dose of withdrawal medication from Supervisory Nurse Menard. Specifically, Librium (or its generic name, Chlordiazepoxide) appears to have been administered.

41.    Chlordiazepoxide is a medication used for treating anxiety disorder, apprehension and anxiety, and withdrawal from acute alcohol use. Upon information and belief, Chlordiazepoxide is not indicated to treat withdrawal from drugs like heroin, and it is unclear why Chlordiazepoxide was prescribed to Ms. Capaci. In addition, using Chlordiazepoxide without proper monitoring can cause fatal side effects. Given Ms. Capaci's underlying asthma, Chlordiazepoxide was not a proper withdrawal medication for her as it can cause severe breathing difficulties. There is no explanation in the records regarding why Chlordiazepoxide was administered instead of alternative medications.

42.    On May 3, 2023, between 6:30pm and 7:30pm, OCCF and Wellpath personnel failed or refused to evaluate Ms. Capaci's condition every 15 minutes as is required by the Special Watch protocol.

43.    On May 3, 2023, between 7:30pm and 11:15pm, the logs indicate that OCCF CO's observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's drug withdrawal as was mandated by OCSO's Special Watch protocol.

44.    Between May 3, 2023, at 11:00pm and May 4, 2023, at 7:00am, CO Castelan (or something similar), Sgt. Miller, and Lt. Torres were on duty.

45.    On May 3, 2023, at 11:40pm, Ms. Capaci was escorted to the Medical Department at OCCF by Medical Officer Dougherty. It is unknown whether Officer Dougherty was employed

by Defendant County, or Defendant Wellpath, or both. On May 4, 2023, at 12:11am, Ms. Capaci returned to her cell after being seen by the Medical Department. It is unclear what, if any, care or treatment was provided by the Medical Department and/or Wellpath personnel, as there is no progress note from this visit to the medical unit. However, medicine administration chart indicates that Ms. Capaci was suffering from nausea and vomiting and was therefore administered Meclizine (anti-nausea medication) by a Wellpath personnel, Dolores Joyce, RN (hereinafter "Nurse Joyce").

46.     Of note, on May 3, 2023, at 11:51pm, an unnamed CO writes in the log that he/she observed Ms. Capaci in her cell pursuant to the Special Watch. However, as Ms. Capaci was still in the Medical Department during this time according to Defendants' own logs, this 11:51pm entry was poor and inaccurate documentation. This error also raises the possibility that at least some of the 15-minute-interval entries claiming to have observed Ms. Capaci may have been entered in error.

47.     On May 4, 2023, at 12:34am, Ms. Capaci was once again escorted to the Medical Department of OCCF by Medical Officer Dougherty so she could receive her medication.

48.     On May 4, 2023, at 12:45am and at 1:00am, the logs indicate that OCCF CO's observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's drug withdrawal as was mandated by OCSO's Special Watch protocol.

49.     Upon information and belief, on May 4, 2023, at around 1:05am, Ms. Capaci received a dose of Chlordiazepoxide from Nurse Joyce. Again, there is no explanation in the records regarding why Chlordiazepoxide was administered instead of alternative withdrawal medications.

50.     On May 4, 2023, between 1:15am and 8:15am, the logs indicate that OCCF CO's

11

observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's drug withdrawal as was mandated by OCSO's Special Watch protocol.

51.    On May 4, 2023, between 7:00am and 3:00pm, CO Warren, Sgt. Brabim (or something similar), and Lt. Moren (or something similar) were on duty.

52.    On May 4, 2023, at around 8:30am, Ms. Capaci again presented to the Medical Department at OCCF.

53.    On May 4, 2023, at 8:35am, Supervisory Nurse Menard reported that Ms. Capaci had a CIWA score of 3, which was designated as "minimal." She did note, however, that compared to the day before, Ms. Capaci had some **nausea, tremor that is "not visible but can be felt fingertip to fingertip," and agitation**.

54.    On May 4, 2023, at 9:00am, Supervisory Nurse Menard reported that Ms. Capaci had a COWS score of 5, which was designated as "mild." She did note, however, that compared to the day before, Ms. Capaci reported complaints of **chills or flushing, difficulty sitting still, and increasing irritability or anxiousness**. This was the case even though Ms. Capaci had taken Chlordiazepoxide, which reduces anxiety.

55.    Upon information and belief, on May 4, 2023, at around 9:05am, Ms. Capaci received a dose of Chlordiazepoxide from Supervisory Nurse Menard. Again, there is no explanation in the records regarding why Chlordiazepoxide was administered instead of alternative withdrawal medications.

56.    On May 4, 2023, between 9:00am and 1:00pm, and at 1:30pm, the logs indicate that OCCF CO's observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's

drug withdrawal as was mandated by OCSO's Special Watch protocol.

57.    On May 4, 2023, at 1:15pm, OCCF and Wellpath personnel failed to evaluate Ms. Capaci's condition as is required by the Special Watch protocol.

58.    On May 4, 2023, at or around 1:45pm, Ms. Capaci underwent a Mental Health Initial Assessment. During this assessment, it was noted that "substance intoxication or detox" was a risk factor, and Ms. Capaci informed Wellpath personnel that she previously received suboxone to treat symptoms of opioid withdrawal; however, she explained to the Wellpath personnel that Suboxone "makes her sick." Instead of Suboxone, it was appreciated and documented that Ms. Capaci had previously used methadone, an alternative to Suboxone, to manage, treat, and/or mitigate the symptoms of opiate withdrawal. This Mental Health Assessment was signed by Timothy Di Persia, Mental Health Professional, and the Form Owner was listed as Dr. Carin Kottraba. These Wellpath providers also noted from direct observation at this time that Ms. Capaci "appeared to be **detoxing evident by shivering, sweating and difficulty focusing**."

59.    Upon information and belief, the primary pharmaceutical component and generic name for Suboxone is buprenorphine.

60.    On May 4, 2023, between 2:00pm and 3:00pm, the logs indicate that OCCF CO's observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's drug withdrawal as was mandated by OCSO's Special Watch protocol.

61.    On May 4, 2023, between 3:00pm and 11:00pm, CO Quira (or something similar), Sgt. Spina, and Lt. Kiszka were on duty.

62.    On May 4, 2023, at 3:02pm, the Medical Department was contacted as Ms. Capaci was experiencing chest pain.

63.    On May 4, 2023, at 3:04pm, CO Laudate arrived on the unit to escort Ms. Capaci to the Medical Department.

64.    On May 4, 2023, at around 3:19pm, Ms. Capaci was evaluated in the Medical Department by Supervisory Nurse Menard. Ms. Capaci explained that she had experienced shortness of breath for about 20 minutes. Supervisory Nurse Menard wrote, "detox medication given"; however, the type of detox medication was not noted in this perfunctory note.

65.    While Supervisory Nurse Menard noted that she evaluated Ms. Capaci's lung sound in relation to the chest pain, there is no indication whatsoever that Ms. Capaci's cardiac function was evaluated as a source of the chest pain. Upon information and belief, chest pain and/or shortness of breath is a serious condition that requires emergent evaluation of cardiac function to detect any possible abnormalities of the heart.

66.    On May 4, 2023, at 3:22pm, Supervisory Nurse Menard reported that Ms. Capaci had a CIWA score of 4, which was designated as "minimal." She did note, however, that Ms. Capaci continued to have some **nausea, tremor that is "not visible but can be felt fingertip to fingertip," agitation, and sweating**. Of note, nausea, tremor, and sweating are three prototypical symptoms of opiate withdrawal that should result in an assessment of whether the current withdrawal management is inadequate and/or improper. This was not done here.

67.    On May 4, 2023, at 3:25pm, Supervisory Nurse Menard reported that Ms. Capaci had a COWS score of 4, which was designated as "mild." She did confirm, however, continuing complaints of **difficulty sitting still, and increasing irritability or anxiousness**.

68.    Upon information and belief, on or around May 4, 2023, Ms. Capaci called her daughter, Aryana Davila, and explained that she was experiencing chest, back, and leg pain. Ms. Davila advised Ms. Capaci to seek medical attention using the intercom button in her cell that

connects her to OCCF staff. After Ms. Capaci pressed the button and requested medical attention, Ms. Capaci's daughter overheard someone mockingly respond, "you're not dying, stop pressing the button."

69.     The OCCF Detainee Handbook informs all detainees that they have a right to receive medical services, and in an emergency, they should advise a staff member of any problem so the Medical Department can be notified. Additionally, the detainee handbook notes that the Medical Director will arrange for an appointment with an outside medical specialist if needed. It is standard procedure for all detainees to receive this handbook when incarcerated at OCCF, and they must sign a receipt confirming that they received the handbook.

70.     Upon information and belief, the relevant logs for detainee behavior and Special Watches from May 4, 2023, at 3:30pm through May 5, 2023, at 10:00pm are missing or non-existent. To the extent that OCCF CO's observed Ms. Capaci's condition every 15 minutes, they failed to abide by OCSO's Special Watch protocol to document those observations to ensure Ms. Capaci's safety and health. The lack of supervision, monitoring, or any documentation thereof reflects the grave indifference that Defendants exhibited towards Ms. Capaci's safety and well-being.

71.     Upon information and belief, on May 5, 2023, at around 1am or 2am, Ms. Capaci presented to the Medical Department again to seek treatment for opiate withdrawal.

72.     On May 5, 2023, at 2:04am, Wellpath personnel Tamara Oglesby, RN (hereinafter "Nurse Oglesby"), reported that Ms. Capaci had a CIWA score of 19, which indicates "moderate to severe" withdrawal. Ms. Capaci was noted to have **"Constant nausea, frequent dry heaves and vomiting," "Moderate" tremors, "Beads of sweat obvious on forehead," agitation, tactile disturbances, anxiety, and headache**. Compared to the last CIWA exam from 12 hours ago, this

reflected a rapid and obvious deterioration of Ms. Capaci's condition.

73.    On May 5, 2023, at 2:10am, Nurse Oglesby also reported that Ms. Capaci had a COWS score of 9, as Ms. Capaci had **"observable" tremors, reported "chills or flushing," "vomiting or diarrhea," reported "difficulty sitting still," as well as "increasing irritability or anxiousness."**

74.    Upon information and belief, there is no evidence that Wellpath medical personnel, including Nurse Oglesby, consulted with a physician regarding Ms. Capaci's extremely concerning symptoms indicated in the clinical notes and the CIWA/COWS score. On May 5, 2023, at around 2:15am, Ms. Capaci received Acetaminophen pill for pain, Meclizine for vomiting, and another dose of Chlordiazepoxide from Nurse Oglesby. Then, **she was discharged to her jail cell**.

75.    Vomiting, tremors, diarrhea, and sweating should have resulted in an urgent referral for inpatient treatment at a hospital and/or opiate withdrawal center because mismanagement of these symptoms can result in dehydration and electrolyte imbalance, causing a rapid shutdown of the body—which is ultimately what happened here.

76.    Ms. Capaci remained incarcerated at OCCF. There is no indication or evidence that the Defendants considered transferring Ms. Capaci to an outside provider for specialty care. In fact, there is no evidence that the Defendants even considered having Ms. Capaci be seen by a physician or medical doctor for evaluation, despite her dire and rapidly worsening condition.

77.    On May 5, 2023, at 5:17am, Defendant Nurse Washington signed a note affirming an order of buprenorphine to be administered on Ms. Capaci, starting bi-daily on May 5, 2023, co-signed by Wellpath Nurse Practitioner, Mandi Lee Zaccagnino (hereinafter "NP Zaccagnino"). There is no note indicating that NP Zaccagnino personally saw or examined Ms. Capaci, and instead, it appears that she relied upon the Wellpath Nurses' examinations and/or notes from

encountering Ms. Capaci.

78.    Less than 24 hours prior to this, on May 4, 2023, at or around 1:45pm, Ms. Capaci underwent a Mental Health Initial Assessment where she explained to other Wellpath providers her intolerance to buprenorphine and history of adverse reactions to it. This information should have been reviewed as part of Defendant Nurse Washington's assessment and treatment plan as it constitutes part of the same chart.

79.    Not only did Ms. Capaci verbally indicate to Wellpath providers that buprenorphine (or Suboxone) makes her sick, but it was also contraindicated for her. Upon information and belief, the use of buprenorphine on patients who have active heroin or fentanyl in their system presents a significant risk of fatal withdrawal. This is due to buprenorphine's ability to rapidly displace the opioids off of a patient's brain and gut receptors, inducing severe and immediate withdrawal in patients, as experienced by Ms. Capaci.

80.    Such induced withdrawals typically manifest in symptoms such as diarrhea and vomiting, as the gastrointestinal tract becomes hyperactive due to the body's accustomed response to the slowing effects of opioids. These symptoms, if not properly managed, can quickly have a cascading effect on the body by causing dehydration, electrolyte balance, and even death.

81.    By the morning of May 5, 2023, at the latest, Ms. Capaci exhibited and complained of symptoms of severe withdrawal, including but not limited to diarrhea, excessive vomiting, tremors, sweating, and tactile disturbances.

82.    Upon information and belief, the loss of electrolytes and salt as a result of excessive diarrhea and vomiting is lethal to bodily functions. Depletion of these essential nutrients, along with dehydration, can lead to an irregular heartbeat. This condition may escalate into a cardiac failure or fatal arrhythmia.

83. Upon information and belief, there are available alternatives to buprenorphine, such as methadone, which do not have these adverse effects on individuals with active heroin or fentanyl in their systems during detoxification.

84. At all relevant times, Defendant County of Orange was and is required by law to have methadone available and accessible at OCCF. See NY Correction Law § 626 (2021); NY Mental Hygiene Law § 19.18-C (2022).

85. Upon information and belief, although Defendant County of Orange applied for a waiver to the above legal requirement to procure methadone for its detainees, their waiver application was rejected prior to May 2023.

86. There was no explanation or reason noted as to why buprenorphine was prescribed to Ms. Capaci instead of a safer, less risky alternative, such as methadone. There is no explanation as to why buprenorphine was prescribed to Ms. Capaci when she has a medical history of adverse reactions to the drug. There is no explanation as to why Defendants did not immediately seek to procure methadone for Ms. Capaci, which would have treated and mitigated her severe withdrawal symptoms.

87. Ms. Capaci's healthcare providers, including Defendant Nurse Washington and the John and Jane Doe Defendants, had the responsibility and duty to review Ms. Capaci's medical history including prior health and mental health records, which included her intolerance and aversion to buprenorphine.

88. Upon information and belief, Wellpath personnel failed to adequately assess, grossly mischaracterized and under-reported the severity of Ms. Capaci's condition.

89. Wellpath personnel failed to elevate Ms. Capaci's level of care by transferring her to a hospital when her COWS and CIWA scores indicated that such care was urgently needed.

18

90.     On May 5, 2023, at 7:48am, Ms. Capaci is seen on cameras exiting her cell in order to make a call at the phone booth. While on the phone, she exhibits visible discomfort including difficulty standing and balancing on her own; she is observed to be leaning against the phone booth and at one point has to squat down as she talks on the phone.

91.     Shortly after this phone call, Ms. Capaci was seen by Wellpath personnel at the Medical Department.

92.     On May 5, 2023, at 8:03am, Supervisory Nurse Menard reported that Ms. Capaci had a CIWA score of 2, which was designated as "minimal."

93.     On May 5, 2023, at 8:06am, Supervisory Nurse Menard reported that Ms. Capaci had a COWS score of 0, which was designated as "mild."

94.     These assessments are contradicted by Ms. Capaci's condition visible on the security cameras, as well as the fact that Ms. Capaci had not received any withdrawal medication since 2am when she was in a severe withdrawal as confirmed by Nurse Oglesby. In addition, at around 9am, Ms. Capaci was prescribed thiamine and folic acid by Wellpath personnel Genvieve Gomez, LPN (hereinafter "Nurse Gomez"), which shows that Ms. Capaci was suffering from electrolyte imbalance that required treatment.

95.     On May 5, 2023, around 9:05am, Ms. Capaci was scheduled to be administered her first dose of buprenorphine via 2mg tablet as part of her "twice a day" buprenorphine prescription order. However, based on Defendants' medication administration chart, it is unclear that this first dose was in fact administered on time.

96.     On May 5, 2023, at or around 1:30pm, Ms. Capaci was seen by Nurse Gomez at the Medical Department and was given **Acetaminophen for pain, Meclizine for vomiting, and Loperamide for diarrhea**. This shows that Ms. Capaci continued to be symptomatic for severe

withdrawal. Wellpath personnel did not document Ms. Capaci's physical condition during this visit and again discharged her to her cell.

97.     On May 5, 2023, at or around 4:05pm, Ms. Capaci was administered what was supposed to be her second dose of buprenorphine despite the medical contraindications and her documented adverse reaction to the drug. Upon information and belief, OCCF and Wellpath personnel administered a double dosage of withdrawal medication, possibly to compensate for the missed dose from 9:05am that day. The medication administration chart reveals that at around 4:05pm, Supervisory Nurse Menard administered both Chlordiazepoxide and buprenorphine to Ms. Capaci. Upon information and belief, this double dosage exacerbated the severe withdrawal symptoms that Ms. Capaci was experiencing as even a single dosage of either Chlordiazepoxide or buprenorphine was contraindicated for her.

98.     Ms. Capaci was administered buprenorphine despite her documented history of adverse reactions to the medication and her pleas to the Defendants that she requires methadone instead. There is no explanation as to why methadone was not offered or considered.

99.     Upon information and belief, OCCF and Wellpath personnel failed to continuously evaluate or monitor Ms. Capaci's condition on May 5, 2023, after Ms. Capaci was administered a dose of buprenorphine. It is shocking that Ms. Capaci was not closely monitored or evaluated after she was given buprenorphine, especially considering the severity of her condition, her medical history of buprenorphine intolerance, and the fact that she was already on a Special Watch requiring a 15-minute-interval monitoring.

100.    On May 5, 2023, at around 5:53pm, Supervisory Nurse Menard reported that Ms. Capaci had a CIWA score of 0 and a COWS score of 1, indicating minimal or mild withdrawal symptoms. Again, these assessments are contradicted by Ms. Capaci's condition visible on the

security cameras. It should also be noted that Wellpath providers including Nurse Gomez and Nurse Oglesby had given Ms. Capaci various medications including thiamine, folic acid, Acetaminophen, Meclizine, and Loperamide throughout this day, which would have masked some of the symptoms without properly resolving the root cause of the symptoms—severe opiate withdrawal. Wellpath personnel each had full access to Ms. Capaci's chart and records and should have taken this into account when evaluating Ms. Capaci's condition.

101.    Upon information and belief, OCCF and Wellpath personnel failed to evaluate Ms. Capaci's condition at all on May 5, 2023, between 6:00pm and 8:15pm, as required by the Special Watch protocol.

102.    On May 5, 2023, at 8:12pm, Ms. Capaci was observed by OCCF and Wellpath staff to be in **excruciating pain and discomfort**. She was transported from her cell to the Medical Department of OCCF via wheelchair. **She was unable to ambulate independently and was unable to stand straight**, which should have been alarming to any reasonable medical provider given the was a previously ambulatory, 40-year-old woman.

103.    On May 5, 2023, at or around 8:30pm, Ms. Capaci was evaluated at the Medical Department of OCCF by Defendant Nurse Washington, who noted that Ms. Capaci was experiencing "excessive vomiting" specifically "related to buprenorphine." Defendant Nurse Washington's note mentioned that Ms. Capaci's most recent dose of buprenorphine was at 5:30pm, and that Ms. Capaci was "not wanting to take it because it would make her feel sick." On observation, Defendant Nurse Washington noted that Ms. Capaci was "restless" and "vomiting profusely." After speaking with an "on-call provider," Defendant Nurse Washington administered a 4mg Zofran (also known as ondansetron) injection to alleviate symptoms of vomiting.

104.    It is unclear why there is a discrepancy between the medication administration chart

where buprenorphine was purportedly administered by Supervisory Nurse Menard at 4:05pm, and Defendant Nurse Washington's progress note where buprenorphine was taken at 5:30pm—or whether Ms. Capaci had been given a double dose of buprenorphine in the afternoon. Wellpath personnel's charts are cursory, perfunctory, and fraught with internal contradictions, which makes it difficult to track Ms. Capaci's history, signs, symptoms, and condition over time.

105.    It is unknown who the "on-call provider" that Defendant Nurse Washington consulted was, or their credential. **It does not appear that Ms. Capaci was physically evaluated by any physician**, even though she was profusely vomiting due to the administration of buprenorphine. Defendants John and Jane Doe #1-10 include this "on-call provider."

106.    Upon information and belief, it was a departure from reasonable medical standards for a physician not to evaluate Ms. Capaci face-to-face considering the severity of her symptoms.

107.    It does not appear that Defendant Nurse Washington requested a transfer to an external facility, face-to-face consultation by a physician, elevation of care, or consideration of whether Ms. Capaci's withdrawal management should be altered. This was the case even though, based on Ms. Capaci's charted history and condition at 8:30pm, Defendant Nurse Washington knew or should have known that Ms. Capaci was in a dire physical condition that could be fatal if improperly managed.

108.    There is no evidence that Defendant Nurse Washington took Ms. Capaci's blood or performed any other assessment to confirm whether Ms. Capaci was suffering from a severe electrolyte imbalance, dehydration, and/or withdrawal.

109.    Defendant Nurse Washington knew or should have known that alternatives to buprenorphine, such as methadone, should have been immediately considered and sought given Ms. Capaci's condition. Yet, Defendant Nurse Washington failed to formulate or implement any

treatment plan in response to Ms. Capaci's buprenorphine intolerance and severe opiate withdrawal.

110.    Defendant Nurse Washington failed to submit the progress note regarding her evaluation until May 6, 2023, at 1:08am, which is about 4.5 hours after the evaluation occurred. This delay again reflects Defendants' failure to properly chart and track Ms. Capaci's history, signs, symptoms, and condition over time.

111.    On May 5, 2023, at or around 9:13pm, Ms. Capaci was once again evaluated at the Medical Department of OCCF. She had been kept in the Medical Department for monitoring after the earlier encounter with Defendant Nurse Washington. Defendant Nurse Washington noted: "**pt still vomiting after receiving IM Zofran**. Call placed to on-call provider, advised to provide another dose of 4mg IM Zofran. … IM injection placed in L-upper arm. Pt tolerated procedure well, **monitored for 5 minutes and returned to unit. Pt will be called to medical for 1am detox check for evaluation of relief of symptoms**."

112.    This progress note, also submitted late at 1:12am the next morning, evidences the lackadaisical attitude Defendants showed towards Ms. Capaci's safety and health. Despite this young woman uncontrollably vomiting even after taking anti-nausea medications and now injections throughout the day, Defendants failed to take reasonable steps to mitigate the risk that Ms. Capaci's condition would deteriorate further.

113.    Before discharging Ms. Capaci, Defendant Nurse Washington again failed or refused to request a transfer to an external facility, face-to-face consultation by a physician, elevation of care, or consideration of whether Ms. Capaci's withdrawal management should be altered. Defendant Nurse Washington also failed to note whether Ms. Capaci's vomiting subsided after the second Zofran injection. The severity of Ms. Capaci's condition warranted a

comprehensive assessment by Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, which was not provided here.

114.    There is no evidence that Defendant Nurse Washington or the "on-call provider" (included in John and Jane Doe #1-10) assessed or ruled out the possibility that Ms. Capaci was suffering from severe electrolyte imbalance and dehydration that could prove to be fatal. These Wellpath providers knew or should have known that discharging Ms. Capaci to her cell, without an alteration in her detoxification management, would only further deteriorate her condition. While Zofran could mask or control the symptoms of vomiting, it did not address the root cause—that Ms. Capaci's digestive tract was in an over-drive due to the rapid withdrawal induced by buprenorphine.

115.    It is shocking and egregious that Ms. Capaci was not seen by a physician before being discharged to her jail cell, even though her vomiting could not be controlled by Defendant Nurse Washington's own admission. Ms. Capaci was also so physically weak at this time that she had to rely on a wheelchair.

116.    When a nurse cannot resolve a patient's problem, a physician must be engaged to evaluate the patient and devise a treatment plan. This is no different in a carceral setting, and in fact, it is crucially important for jail providers to ensure prompt physician consultation when needed by a patient—because the patient does not have an ability to seek autonomous medical care or second opinion from an external provider.

117.    Upon information and belief, Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, should have contacted Emergency Medical Services (hereinafter "EMS") at this time to transfer Ms. Capaci to a hospital as they failed to control her vomiting nor to resolve its root cause—opiate withdrawal.

118.    Defendant Nurse Washington's 5-minute monitoring after providing a second injection of Zofran was grossly inadequate and careless, given Ms. Capaci's dire physical condition. At a minimum, Ms. Capaci required constant one-on-one monitoring, observation, and care, and there was no justification as to discharging her to her general population cell at this time. It is extraordinary that Defendant Nurse Washington did not even keep Ms. Capaci admitted to the Medical Department and discharged her back to her cell.

119.    Wellpath personnel, including Defendant Nurse Washington's, plan to monitor Ms. Capaci again in four hours at 1:00am was grossly inadequate and deliberately indifferent to Ms. Capaci's health.

120.    On May 5, 2023, at or around 9:15 pm, Ms. Capaci returned to her cell. She was observed by OCCF and Wellpath staff to be without adequate balance and unable to ambulate without assistance. She exhibited obvious signs of pain, clutching her abdomen as she walked.

121.    Although Ms. Capaci was clearly exhibiting an adverse reaction to buprenorphine, Wellpath personnel, including but not limited to Defendant Nurse Washington, failed to cancel the buprenorphine prescription ordered for Ms. Capaci. Wellpath personnel intended to continue administering buprenorphine to Ms. Capaci rather than switching her to a different and more appropriate withdrawal medication, such as methadone.

122.    Upon information and belief, on or around May 5, 2023, at around 9:18pm, Ms. Capaci spoke with her boyfriend on the phone explaining that she was very ill, experiencing significant pain, and vomiting uncontrollably.

123.    After this, Ms. Capaci once again used the intercom in her cell to request that OCCF staff transfer her to the Medical Department.

124.    Upon information and belief, Ms. Capaci's complaints and pleas for help were

ignored as she was not taken to the Medical Department at the time requested.

125.    On May 5, 2023, between 10:00pm and 11:15pm, the logs indicate that OCCF CO's observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's drug withdrawal as was mandated by OCSO's Special Watch protocol.

126.    From May 5, 2023, at 11:00pm until May 6, 2023, at 7:00am, Defendant CO Dasraj and Lt. Torres were on duty.

127.    On May 5, 2023, at 11:34pm, Defendant CO Dasraj only walked past Ms. Capaci's cell, and did not check or evaluate Ms. Capaci's condition for symptoms of withdrawal as required by the Special Watch Protocol.

128.    Upon information and belief, after this walk at 11:34pm, Defendant CO Dasraj and Wellpath personnel failed to monitor Ms. Capaci every 15 minutes as was required by the Special Watch protocol. Her condition was dire, with uncontrollable profuse vomiting that should have been concerning to the Defendants.

129.    On May 6, 2023, at 12:04am, Defendant CO Dasraj made a note stating that Ms. Capaci was "throwing up," presumably in her cell. Shockingly, however, there is no indication that Defendant CO Dasraj informed the Medical Department of Ms. Capaci's vomiting, as would be required by the Special Watch protocol. Ms. Capaci was not immediately transferred to the medical department. She was left to suffer inhumanely in her jail cell.

130.    On May 6, 2023, between 12:15am and 1:30am, the logs indicate that OCCF CO's observed Ms. Capaci in her cell approximately every 15 minutes. However, the CO's failed to document any specific observation related to signs or symptoms of Ms. Capaci's drug withdrawal as was mandated by OCSO's Special Watch protocol.

131.    On May 6, 2023, at 1:35am, Ms. Capaci was brought to the Medical Department at OCCF. Upon information and belief, Ms. Capaci remained at the Medical Department until around 1:45am on May 6, 2023. In other words, despite her dire physical condition, her encounter with the Wellpath medical providers only lasted about 10 minutes.

132.    When she arrived at the Medical Department, Ms. Capaci had severe difficulty with balance, frequently placing her hand against the wall as she walked. At one point, she lay on the floor due to exhaustion as she waited for a CO to open a door for her. She was unable to keep her body, or even her head, up at this point without significant visible effort.

133.    On May 6, 2023, at 1:39am, Defendant Nurse Washington reported that Ms. Capaci had a CIWA score of 10, which is considered a "mild to moderate" withdrawal. Defendant Nurse Washington noted that Ms. Capaci had **"intermittent nausea with dry heaves," paroxysmal sweats, tactile disturbances, auditory disturbances, visual disturbances, anxiety, and headache**. The nausea had clearly continued despite being administered double doses of Zofran injection four hours ago.

134.    On May 6, 2023, at 1:43am, Defendant Nurse Washington reported that Ms. Capaci had a COWS score of 8. Defendant Nurse Washington confirmed that Ms. Capaci was suffering from "**Vomiting or diarrhea," reported "chills or flushing," reported "difficulty sitting still," and "obvious" irritability and anxiety**.

135.    For this encounter, it appears that Defendant Nurse Washington did not submit a progress note. It appears that she saw Ms. Capaci for 10 minutes, administered the CIWA and COWS assessments, and discharged her to her cell. The medication administration chart indicates that Defendant Washington administered another Chlordiazepoxide to Ms. Capaci before discharging her, knowing that this medication (along with buprenorphine) had only made her sick

over the last day.

136.    Defendant Nurse Washington again failed or refused to request a transfer to an external facility, face-to-face consultation by a physician, elevation of care, or consideration of whether Ms. Capaci's withdrawal management should be altered.

137.    There is no evidence that Defendant Nurse Washington communicated with OCCF CO's including Defendant CO Dasraj, to ensure that Ms. Capaci's condition will be monitored consistently. Ms. Capaci was returned to her general population cell where she would be monitored at most every 15 minutes.

138.    After leaving the Medical Department at around 2am, Ms. Capaci had to be taken back to her cell via wheelchair. She was in a semi-conscious state, with her eyes closed and head limp. She was extremely unwell, as seen by the fact that she would be found dead in her cell a mere four hours later.

139.    Upon information and belief, Defendant CO Dasraj and Wellpath personnel failed to adequately monitor, evaluate, and supervise Ms. Capaci on May 6, 2023, at 15-minute intervals after her return to her cell from the Medical Department up until 5:30am, as is required by the Special Watch protocol. Furthermore, the 5:30am watch entry was only recorded after the fact, as it appears under a later entry timed at 6:06am, calling into question the veracity and accuracy of this "Special Watch."

140.    The available log entries, from 2:45am and between 4am and 5am, only note that Ms. Capaci was lying on her bed in her cell. Upon information and belief, Defendant CO Dasraj and Wellpath personnel never properly evaluated her condition as was required by the Special Watch protocol.

141.    It is extraordinary and inexplicable that the OCCF and Wellpath personnel

continually and egregiously violated the Special Watch protocol despite Ms. Capaci's condition, risk factors, and symptomology. Even when the 15-minute checks were performed, the monitoring was cursory and nominal, often reduced to a single glance into the jail cell. The documentation of these checks reflects the blatant indifference of OCCF and Wellpath personnel towards Ms. Capaci's well-being; the logs are inadequate and sometimes inaccurate.

142.    Ms. Capaci was on a 15-minute enhanced supervision schedule due to her increased risk of a severe medical emergency and had in fact exhibited signs of a medical crisis. The protocol mandated more than just cursory check-in's on Ms. Capaci; the protocol explicitly outlines symptoms necessitating immediate medical attention, including vomiting, labored breathing, sweating, and pain—all of which Ms. Capaci exhibited in the presence of OCCF and Wellpath personnel throughout her time in custody, and especially in a day leading up to her death.

143.    On May 6, 2023, at or around 6:04am, Ms. Capaci was observed in her cell to be lying on her back on the floor, with her head tilted to the side. She was unresponsive, pulseless, and breathless. Per OCCF protocol, Ms. Capaci was provided CPR and 911/EMS was called.

144.    While administering CPR, OCCF personnel attempted to locate a pulse on Ms. Capaci so that she could receive a shock from the Automated External Defibrillator (hereinafter "AED") machine.

145.    OCCF personnel continued to administer CPR to Ms. Capaci. A rebreather was applied to Ms. Capaci at approximately 6:08am.

146.    About 11 minutes after 911 was called, EMS arrived on the scene, took over the resuscitative efforts, and stated that no shocks were administered by the AED. Concerned that the machine was not working properly, OCCF personnel brought a second AED machine to the scene and connected it to Ms. Capaci.

147.    About 17 minutes after 911 was called, the second AED also would not administer a shock to Ms. Capaci.

148.    Upon information and belief, EMS discontinued their efforts to resuscitate "due to prolonged down time and obvious signs of death." The paramedics communicated to OCCF CO's that based on color, temperature, and lividity of the body, Ms. Capaci was considered an obvious death. Upon information and belief, a paramedic on the scene said, "At this point, she's so gone that we don't even need medical control. Like it's an obvious death."

149.    The EMS paramedics indicated in their incident report that they were not certain about Ms. Capaci's time of death. There is a possibility that Ms. Capaci had died or gone into a cardiac failure some time before she was found unresponsive at 6:04am.

150.    Upon information and belief, Ms. Capaci's chances of survival and resuscitation would have increased if medical care was administered sooner.

151.    Upon information and belief, Defendant CO Dasraj repeatedly failed to monitor or evaluate Ms. Capaci throughout the early morning of May 6, 2023, including but not limited to the hour leading up to when she was discovered unconscious and unresponsive on the floor.

152.    Defendant CO Dasraj violated the Special Watches protocol by failing to monitor Ms. Capaci every 15 minutes.

153.    Sadly, even after Ms. Capaci's body was found, OCCF CO's were primarily concerned with moving Ms. Capaci's body elsewhere instead of conveying accurate information to the paramedics about how Ms. Capaci's death occurred under their watch and custody. The CO's on the scene were focused on getting the paramedics to remove Ms. Capaci's body out of the jail as fast as possible and to pronounce death elsewhere, despite the paramedics' objections.

154.    Upon information and belief, EMS personnel eventually helped move Ms. Capaci's

body to an X-Ray room at the request of OCCF staff.

155.    On May 6, 2023, at 6:27am, Ms. Capaci was declared dead by medical professionals on the scene.

156.    On May 9, 2023, an autopsy of Niki Capaci was conducted by Defendant Orange County's Medical Examiner (hereinafter "OCME").

157.    OCME determined that Ms. Capaci's cause of death was "acute drug intoxication including fentanyl, para-Fluorofentanyl, xylazine, chlordiazepoxide, and diazepam." Additionally, her manner of death was determined to be "accident (substance abuse)."

158.    Upon information and belief, OCME failed to properly evaluate Ms. Capaci's cause of death by failing to acknowledge the impact of the improper administration of buprenorphine and improper withdrawal management by Defendants.

159.    Regardless, OCME's autopsy is consistent with mismanaged withdrawal being the cause of Ms. Capaci's death. Given Ms. Capaci's history of drug use, the elevated level of drugs in her system is to be expected. It does not rule out the likelihood that Ms. Capaci suffered a rapid induced opiate withdrawal that was mismanaged by Defendants, resulting in persistent vomiting, severe dehydration, and eventual death. Indeed, the autopsy does not rule out dehydration or elevated level of buprenorphine. Moreover, the autopsy report does not even reference Ms. Capaci's last three days spent in OCCF at all, even though it clearly had a bearing on her death.

160.    In summary, Defendants' willful withholding of proper medical care and treatment with regard to Ms. Capaci's opiate withdrawal during a critical period caused her to suffer cruel and unusual treatment that directly resulted in her untimely death.

161.    During relevant times, Defendants were adequately informed of Ms. Capaci's condition and knew that her condition was serious and progressive.

31

162.    From May 3, 2023, through May 6, 2023, Ms. Capaci pleaded for medical attention, explicitly informed Defendants that buprenorphine did not work for her, and explained to Defendants including Defendant Nurse Washington that buprenorphine was making her extremely sick.

163.    Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, recklessly and negligently administered buprenorphine to Ms. Capaci despite their documented knowledge of the proven negative impact buprenorphine had on Ms. Capaci.

164.    Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, failed in their duty to monitor Ms. Capaci on a consistent basis when she was profusely and intractably vomiting.

165.    Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, failed in their duty to properly assess Ms. Capaci's condition, including through accurate history-taking and CIWA/COWS monitoring.

166.    Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, failed in their duty to have Ms. Capaci be examined by a physician, even though it was clearly needed based on her rapidly declining condition.

167.    Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, failed to diagnose, triage, and transfer Ms. Capaci to a hospital when the severity of her symptoms necessitated such elevation of care. Every time Ms. Capaci presented to the Medical Department, she was discharged back to her cell.

168.    Wellpath personnel, including but not limited to Defendant Nurse Washington and John and Jane Doe #1-10, failed to inform Ms. Capaci and her family of the foreseeable risks and

benefits of, and alternatives to, the course of treatment proposed and rendered to Ms. Capaci.

169.    At all relevant times, OCCF personnel, including but not limited to Defendant CO Dasraj and John and Jane Doe #1-10, failed in their duty to monitor Ms. Capaci every 15 minutes and to report any symptoms of withdrawal to Wellpath personnel, as mandated by the Special Watches protocol.

170.    While numerous CO's failed to abide by the Special Watches protocol, Defendant CO Dasraj was the last CO in charge of monitoring Ms. Capaci for hours leading up to her death. Defendant CO Dasraj failed to monitor and evaluate Ms. Capaci's condition for at least four hours leading up to her death.

171.    Upon information and belief, OCCF personnel, including but not limited to Defendant CO Dasraj and John and Jane Doe #1-10, failed to maintain a Behavioral Health Log tracking the withdrawal symptoms experienced by Ms. Capaci.

172.    On at least two occasions, an OCCF Staff member whose identity is currently unknown failed in their duty to immediately transfer Ms. Capaci to the Medical Department when she called requesting assistance over the intercom in her cell, first on May 4 and again on May 5. It is evident that OCCF staff did not take Ms. Capaci's complaints seriously.

173.    Defendants, including but not limited to Defendant Nurse Washington and Defendant CO Dasraj, failed to elevate Ms. Capaci's level of care when her symptoms and CIWA/COWS scores were becoming increasingly severe.

174.    Defendants, including but not limited to Defendant Nurse Washington and Defendant CO Dasraj, knew or should have known that Ms. Capaci had developed a medical emergency that could cause catastrophic and irreversible damage unless promptly diagnosed and treated.

175.    Defendants, including but not limited to Defendant Nurse Washington and Defendant CO Dasraj, knew and consciously disregarded that a patient such as Ms. Capaci, with severe and worsening symptoms of withdrawal, requires urgent medical intervention, and that unless she timely received said medical care, she would be subject to an imminent risk of serious injury including death.

176.    Defendants' acts and omissions in failing to provide Ms. Capaci access to proper treatment for her serious medical condition were so far below acceptable standards of care that Defendants could not truly have been making medical judgments.

177.    Defendants' actions exacerbated Ms. Capaci's withdrawal symptoms to a fatal level, rather than mitigating them. Defendants continued to provide Ms. Capaci with withdrawal medications that made her more ill.

178.    Ms. Capaci's suffering and discomfort was exacerbated by the Defendants' willful and/or negligent failure to provide Ms. Capaci with asthma medication, including but not limited to albuterol, despite her pleas and despite being fully aware of her condition.

179.    Defendant County of Orange and Defendant Wellpath maintained policies, procedures, customs, and practices that exhibited deliberate indifference to the medical needs of pre-trial detainees such as Ms. Capaci.

180.    Plaintiff's and Ms. Capaci's injuries were a direct result of Defendants' deliberate indifference to Ms. Capaci's health and safety, Defendants' disregard of the excessive risk of harm to Ms. Capaci's health and safety, and/or Defendants' negligent failure to provide adequate medical care, supervision, and treatment to Ms. Capaci.

181.    Plaintiff filed a sworn Notice of Claim within 90 days after the claims alleged herein arose. The notice was served on Defendant County on or about July 14, 2023. Plaintiff sat for her

50-h examination on September 7, 2023.

182.    After being appointed as the Administrator of Ms. Capaci's estate by Orange County surrogate court, Plaintiff served an amended Notice of Claim on Defendant County on or about December 4, 2023.

## FIRST CAUSE OF ACTION
### (Deliberate Indifference to Serious Medical Need under 42 U.S.C. § 1983)
### (Against Defendants CO Dasraj and Nurse Washington)

183.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

184.    At all relevant times, Defendant CO Dasraj was acting in his individual and official capacities, under color of state law.

185.    At all relevant times, Defendant Nurse Washington was acting in her individual and official capacities, under color of state law.

186.    Defendants' conduct deprived Ms. Capaci of her rights protected under the United States Constitution, in that they failed to provide Ms. Capaci with adequate medical care during a critical period, although they knew or should have known that doing so posed an excessive risk to her health.

187.    At all relevant times, Ms. Capaci, as a pre-trial detainee, had a right secured by the Due Process Clause of the Fourteenth Amendment to be free from deliberate indifference to her serious medical needs while detained at OCCF.

188.    Even if Ms. Capaci was considered a prisoner, not a detainee, she had a right secured by the Cruel and Unusual Punishment Clause of the Eighth Amendment to be free from deliberate indifference to her serious medical needs while detained at OCCF.

189.    Defendants' deliberate indifference to Ms. Capaci's known serious medical needs

violated Ms. Capaci's constitutional rights under the Eighth and/or Fourteenth Amendment.

190.    Ms. Capaci faced an objectively substantial risk of serious medical harm and therefore had a sufficiently serious medical need. *Inter alia,* Ms. Capaci was suffering from opioid use disorder and severe withdrawal symptoms, which led to her death. Ms. Capaci required immediate inpatient treatment for detoxification and constant monitoring to save her life. This need was met with deliberate indifference from the Defendants.

191.    Each of the Defendants knew of and disregarded the excessive risk of harm to Ms. Capaci's health and safety, caused by an emergent and progressive medical condition.

192.    Defendant CO Dasraj knew that Ms. Capaci was on OCCF Special Watches protocol specifically for "Alcohol/Drug Withdrawal" and required monitoring by CO's every 15 minutes. Despite this awareness, Defendant CO Dasraj only performed superficial and cursory watches, and on numerous occasions, failed to monitor Ms. Capaci altogether. Furthermore, Defendant CO Dasraj personally observed Ms. Capaci with alarming and emergent symptoms, including but not limited to excessive vomiting, nausea, tremors, paroxysmal sweats, inability to balance, inability to ambulate, excruciating pain, tactile disturbances, auditory and visual disturbances, chest pain, and shortness of breath. Despite this knowledge of Ms. Capaci's condition, Defendant CO Dasraj disregarded the excessive risk of harm to Ms. Capaci's health and safety.

193.    Defendant Nurse Washington knew that Ms. Capaci was having a medical emergency related to opiate withdrawal. Defendant Nurse Washington knew that buprenorphine was not working for Ms. Capaci and was in fact making her sicker. Defendant Nurse Washington knew that there were other medications that could be used to alleviate the pain and discomfort associated with opioid dependence. Defendant Nurse Washington knew that Ms. Capaci had

intractable vomiting, sweating, tremors, diarrhea, ambulatory difficulties, and other symptoms of fatal withdrawal that were not relieved with symptomatic management. Defendant Nurse Washington knew that Ms. Capaci urgently required triage, assessment, and treatment in an inpatient setting, given that her symptoms had not subsided and in fact worsened under OCCF custody despite her repeated presentations to the Medical Department. Despite this knowledge of Ms. Capaci's condition, Defendant Nurse Washington disregarded the excessive risk of harm to Ms. Capaci's health and safety and discharged Ms. Capaci to her jail cell without proper detoxification and/or monitoring mechanism in place.

194.    Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Ms. Capaci's injuries and damages, yet did not do so and instead inflicted unnecessary pain.

195.    As a direct and proximate result of the aforementioned conduct of Defendants, Ms. Capaci suffered extraordinary conscious pain and suffering, emotional distress, fear of impending death, economic damages, catastrophic injuries, and other damages, both general and special.

196.    As a direct and proximate result of the aforementioned conduct of Defendants, Ms. Capaci sustained damages in an amount to be determined at trial.

197.    Plaintiff also demands punitive damages as to this Cause of Action.

198.    Defendants' deliberate indifference in the face of an ongoing medical emergency constitutes a willful or malicious violation of Ms. Capaci's constitutional, statutory, and civil rights, which justifies an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Municipal Liability under 42 U.S.C. § 1983)**
**(Against Defendant County of Orange)**

199.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth

herein.

200.    The deprivation of Ms. Capaci's constitutional rights under the Eighth and/or Fourteenth Amendment occurred as a direct result of one or more policies, customs, patterns, and/or practices of Defendant County of Orange.

201.    At all relevant times, Defendant County pursued a policy, custom, pattern, and/or practice demonstrating deliberate indifference to prisoners and detainees in need of serious medical care, including Ms. Capaci.

202.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure, or rule of the municipality, which is forbidden by the Constitution of the United States.

203.    It was Defendant County's policy, custom, pattern, and practice to refuse to provide methadone, a life-saving medication, to detainees at OCCF.

204.    Pursuant to NY Correction Law § 626 (2021) and NY Mental Hygiene Law § 19.18-C (2022), Defendant County was required to make medication-assisted treatment (hereinafter "MAT") services available at its local jails. Specifically, the laws require Defendant County to procure different withdrawal medications including methadone, buprenorphine, and naltrexone, so that the medical needs of those like Ms. Capaci can be met.[1] Defendant County specifically applied for a waiver from the methadone requirement, which application was rejected in 2022.

205.    Upon information and belief, despite the rejection of methadone waiver application, Defendant County knowingly, intentionally, and recklessly did not obtain nor seek access to

---

[1] Legislation S1795/A533 that was eventually codified into NY Correction Law § 626 (2021) and NY Mental Hygiene Law § 19.18-C (2022) was vehemently opposed by the New York State Sheriffs' Association, an organization that represents the interests of all 58 of New York State's sheriffs. These sheriffs are now in charge of implementing this law.

methadone.[2]

206.    Defendant County and its officials possessing final policy-making authority knowingly persisted in denying the provision of methadone at OCCF, effectively elevating this practice as a custom with the force of law. Defendant County took no steps to rectify its noncompliance with New York State Law, and knowingly continued to deny the provision and availability of methadone to the detainees under its care and custody,

207.    Defendant County's municipal policy, custom, and practice of denying methadone to its detainees constitutes deliberate indifference to the detainees' medical needs, as exemplified by Ms. Capaci's case where she was deprived of life-saving medical treatment as a result.

208.    Defendant County developed and maintained policies, procedures, customs and/or practices in the training and supervision of its employees, which resulted in deliberate indifference to the rights of prisoners and detainees under their custody.

209.    Defendant County developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to ignore signs of fatal opiate withdrawal.

210.    Defendant County developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to repeatedly discharge a patient undergoing severe opiate withdrawal to their jail cell without proper monitoring or control.

211.    Defendant County developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to

---

[2] While certain New York counties may secure a waiver by demonstrating the absence of a methadone clinic in their county, Orange County's Port Jervis Clinic OP, a licensed methadone treatment facility, is located just approximately 23 miles away from Orange County Correctional Facility. In other words, there is no reason why methadone should not be available to detainees at OCCF.

repeatedly discharge such patient without being seen or examined by a physician.

212.   Defendant County developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to repeatedly discharge such patient without being transferred to a hospital or another inpatient setting for elevated medical care.

213.   It was Defendant County's policy, custom, pattern, and practice that allowed Defendants to refuse adequate medical care to Ms. Capaci and to disregard the excessive risk of harm to her health and welfare.

214.   But for Defendant City's unlawful policy, custom, pattern, and practice, Ms. Capaci would have been appropriately monitored and received detoxification that she required, sparing her significant and unnecessary pain, suffering, and unmonitored death.

215.   The foregoing customs, policies, usages, practices, procedures, and rules of the County of Orange, OCCF, and/or OCSO constituted deliberate indifference to the safety, well-being, and constitutional rights of Ms. Capaci.

216.   The foregoing customs, policies, usages, practices, procedures, and rules of the County of Orange, OCCF, and/or OCSO were the moving force behind, and the direct and proximate cause of, the constitutional violations suffered by Ms. Capaci as alleged herein.

217.   Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating Ms. Capaci's constitutional rights through their policy-making authority.

218.   As a direct and proximate result of the customs, policies, usages, practices, procedures, and rules of the County of Orange, OCCF, and/or OCSO, Ms. Capaci suffered extraordinary conscious pain and suffering, emotional distress, fear of impending death, economic

damages, catastrophic injuries, and other damages, both general and special.

219.    As a direct and proximate result of the customs, policies, usages, practices, procedures, and rules of the County of Orange, OCCF, and/or OCSO, Ms. Capaci sustained damages in an amount to be determined at trial.

220.    Plaintiff also demands punitive damages as to this Cause of Action.

221.    Defendants' deliberate indifference in the face of an ongoing medical emergency constitutes a willful or malicious violation of Ms. Capaci's constitutional, statutory, and civil rights, which justifies an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Municipal Liability under 42 U.S.C. § 1983)
### (Against Defendants Wellpath, LLC and New York Correct Care Solutions Medical Services, P.C.)

222.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

223.    At all relevant times, Defendants Wellpath, LLC and/or New York Correct Care Solutions Medical Services, P.C. (collectively "Defendant Wellpath") was a private entity that was a functional equivalent to a municipality. Defendant Wellpath, as a contractor and/or employee and/or agent of Defendant County of Orange, performed traditional government functions in that Wellpath provided medical services, care, and treatment to all detainees at OCCF. This function would normally fall within the purview of the municipality.

224.    Once at OCCF, prisoners and detainees do not have the right to choose medical providers. Instead, they must rely upon the supervision, care, and treatment of Wellpath. In this sense, Wellpath performs what would traditionally be viewed as governmental functions vis-à-vis OCCF's prisoners and detainees including Ms. Capaci.

225.    At all relevant times, Ms. Capaci had constitutional rights under the Eighth and/or

Fourteenth Amendment to be free from deliberate indifference to her serious medical needs. Ms. Capaci was deprived of these rights as a direct result of one or more policies, customs, patterns, and/or practices of Defendant Wellpath.

226.    At all relevant times, Defendant Wellpath pursued a policy, custom, pattern, and/or practice demonstrating deliberate indifference to prisoners and detainees in need of serious medical care, including Ms. Capaci.

227.    It was Defendant Wellpath's policy, custom, pattern, and practice to provide opiate withdrawal medications such as Chlordiazepoxide and buprenorphine without consideration of their efficacy and harm compared to the alternatives available.

228.    It was Defendant Wellpath's policy, custom, pattern, and practice to refrain from providing methadone to OCCF detainees and from providing them with a higher, in-patient level of care (which methadone typically requires).

229.    It was Defendant Wellpath's policy, custom, pattern, and practice to refrain from keeping detailed documentation regarding communication with physician, "on-call provider," or OCCF CO's regarding the care, treatment, or supervision of detainees.

230.    Defendant Wellpath's policy, custom, and practice of denying methadone to OCCF detainees constitutes deliberate indifference to the detainees' medical needs, as exemplified by Ms. Capaci's case where she was deprived of life-saving medical treatment as a result.

231.    Defendant Wellpath developed and maintained policies, procedures, customs and/or practices in the training and supervision of its employees, which resulted in deliberate indifference to the rights of prisoners and detainees under their care.

232.    Defendant Wellpath developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to

ignore signs of fatal opiate withdrawal.

233.    Defendant Wellpath developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to repeatedly discharge a patient undergoing severe opiate withdrawal to their jail cell without proper monitoring or control.

234.    Defendant Wellpath developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to repeatedly discharge such patient without being seen or examined by a physician.

235.    Defendant Wellpath developed and maintained policies, procedures, customs and/or practices that allowed the Defendants herein and other OCCF and/or Wellpath personnel to repeatedly discharge such patient without being transferred to a hospital or another inpatient setting for elevated medical care.

236.    Defendant Wellpath failed to train and supervise its employees despite repeated complaints of constitutional and civil rights violations surrounding their failure to provide adequate medical care, and specifically their failure to treat incarcerated persons for drug and alcohol withdrawal. These complaints established a pattern of constitutional violation by Wellpath's unqualified, untrained, or inadequately trained staff failing to respond to incarcerated persons' serious medical needs.[3]

237.    Despite numerous prior complaints against Wellpath for its employees' deficient

---

[3] Plaintiff can cite to multiple lawsuits against Wellpath involving their failure to treat alcohol or drug withdrawal including, e.g., Norman v Wellpath, LLC, 3:19-CV-02095-MO, 2022 WL 1516262 [D Or May 13, 2022]; Craddock v. Cnty. of Macomb, No. 21-CV-12827, 2024 WL 775172, at *1 (E.D. Mich. Feb. 26, 2024); Gaines v. Cnty. of Wayne, No. 20-11186, 2022 WL 17325914, at *1 (E.D. Mich. Nov. 29, 2022); and Est. of Miller v. Cnty. of Sutter, No. 220CV00577KJMDMC, 2020 WL 6392565, at *1 (E.D. Cal. Oct. 30, 2020).

medical care, Defendant Wellpath made no meaningful attempt to change its withdrawal treatment policies to address these substantive deficiencies or to improve its employee training and supervision to that end.

238.    It was Defendant Wellpath's policy, custom, pattern, and practice that allowed Defendants to refuse adequate medical care to Ms. Capaci and to disregard the excessive risk of harm to her health and welfare.

239.    But for Defendant Wellpath's unlawful policy, custom, pattern, and practice, Ms. Capaci would have been appropriately monitored and received detoxification that she required, sparing her significant and unnecessary pain, suffering, and premature death.

240.    The foregoing customs, policies, usages, practices, procedures, and rules of Defendant Wellpath constituted deliberate indifference to the safety, well-being, and constitutional rights of Ms. Capaci.

241.    The foregoing customs, policies, usages, practices, procedures, and rules of Defendant Wellpath were the moving force behind, and the direct and proximate cause of, the constitutional violations suffered by Ms. Capaci as alleged herein.

242.    As a direct and proximate result of the customs, policies, usages, practices, procedures, and rules of Wellpath, Ms. Capaci suffered extraordinary conscious pain and suffering, emotional distress, fear of impending death, economic damages, catastrophic injuries, and other damages, both general and special.

243.    As a direct and proximate result of the customs, policies, usages, practices, procedures, and rules of Wellpath, Ms. Capaci sustained damages in an amount to be determined at trial.

244.    Plaintiff also demands punitive damages as to this Cause of Action.

245.    Defendants' deliberate indifference in the face of an ongoing medical emergency constitutes a willful or malicious violation of Ms. Capaci's constitutional, statutory, and civil rights, which justifies an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Medical Malpractice)
### (Against Defendants County, Wellpath, LLC, New York Correct Care Solutions Medical Services, P.C., and Nurse Washington)

246.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

247.    At all relevant times, Defendant Nurse Washington and other medical personnel involved in Ms. Capaci's care were medical professionals duly licensed to practice medicine in the State of New York. They were employed by Defendant County or employed by Defendants Wellpath, LLC and/or New York Correct Care Solutions Medical Services, P.C. (collectively "Defendant Wellpath") and contracted by Defendant County, to render medical care and treatment at OCCF in those capacities.

248.    At all relevant times, Defendant Nurse Washington and other medical personnel held each of themselves out to the prisoners and detainees incarcerated in the custody of OCCF, and in particular to Ms. Capaci, as medical professionals offering professional services.

249.    At all relevant times, Defendant Nurse Washington and other medical personnel each represented themselves to be skilled, competent, and careful healthcare providers with the knowledge and capacity to practice medicine in accordance with the standards common and acceptable in the community.

250.    It was the duty of the Defendants County and Wellpath, and their respective agents, servants, contractors, and/or employees to ensure that prisoners or detainees with requisite emergent medical need are promptly taken to external medical providers for proper care and

treatment.

251.    Defendants failed to acknowledge, diagnose, or treat Ms. Capaci's serious and progressive medical condition.

252.    As set forth herein, Defendants' medical and nursing care, diagnosis, treatment, and services of Ms. Capaci were rendered carelessly, recklessly, unskillfully, negligently, and not in accordance with accepted standards of medical and nursing care, diagnosis, treatment, and services in the community as the standards existed at the time.

253.    Defendants did not possess the necessary skill to care for and treat Ms. Capaci.

254.    Defendants neglected to apply the skill they did have.

255.    Defendants did not use reasonable care in applying the skill they had.

256.    Defendants were negligent and departed from the standard of care when they failed to offer different withdrawal medications, personal encounter with a physician, and/or inpatient or hospital care to Ms. Capaci, even though she was exhibiting serious and unresolved symptoms of withdrawal including but not limited to: chest pain, intractable vomiting, profuse vomiting, nausea, shivering, chills, sweating, difficulty breathing, difficulty focusing, altered mental status, restlessness, tremors, agitation, anxiety, paroxysmal sweats, abnormal vital signs, body aches, and tactical, auditory, and visual disturbances.

257.    Defendants were negligent and departed from the standard of care when they failed to have Ms. Capaci be examined in person by a physician.

258.    Defendants were negligent and departed from the standard of care when they failed to monitor Ms. Capaci consistently.

259.    Defendants were negligent and departed from the standard of care in other ways that are documented in the medical or jail records and in ways of which Plaintiff is not yet aware.

260.    At all relevant times, each of the Defendants stood in such a relationship with the other Defendants in their care and treatment of Ms. Capaci as to make each of the Defendants liable for the acts and omissions of all other Defendants with regard to their care, diagnosis, and treatment rendered to Ms. Capaci, or lack thereof.

261.    Defendant County of Orange is liable for the negligence of its agents, servants, contractors, and employees including but not limited to Defendant Nurse Washington under the doctrine of *respondeat superior*.

262.    Defendant Wellpath is liable for the negligence of its agents, servants, contractors, and employees including but not limited to Defendant Nurse Washington under the doctrine of *respondeat superior*.

263.    Ms. Capaci's injuries herein were caused by the carelessness, recklessness, and negligence of Defendant County and/or Defendant Wellpath and its respective agents, employees, and contractors, who were on duty and acting in the scope of their employment when they engaged in the wrongful conduct described herein.

264.    Ms. Capaci's injuries were inflicted solely through the negligence of the Defendants, and through no fault or want of care or negligence or contributory negligence on the part of Ms. Capaci.

265.    Defendants' conduct was grossly negligent in that Defendants were so careless as to show complete disregard for the rights and safety of Ms. Capaci.

266.    Defendants were aware of facts that gave rise to an unreasonable risk that Ms. Capaci would be irreparably injured.

267.    It was foreseeable to the Defendants, based on facts known to them, that Ms. Capaci was at risk of imminent serious harm.

268.    Yet, Defendants failed and/or refused to treat Ms. Capaci's opiate withdrawal with the necessary skill, competence, knowledge, or urgency that was required.

269.    Defendants' conduct constitutes the tort of medical malpractice under the laws of the State of New York.

270.    This action falls within one or more of the exceptions set forth in CPLR § 1602, and as such, the Defendants are jointly and severally liable pursuant to the exceptions set for in Article 16 of the CPLR.

271.    Pursuant to CPLR § 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiff's damages, including but not limited to her non-economic loss, by reason of the fact that Defendants' liability arose by reason of a non-delegable duty of care owed to Ms. Capaci and/or by reason of the doctrine of *respondeat superior*.

272.    Pursuant to CPLR § 1602(7), Defendants are jointly and severally liable for all of the Plaintiff's damages, including but not limited to her non-economic loss, by reason of the fact that Defendants acted in such a reckless manner as to completely disregard the consequences of their actions on the safety of others including Ms. Capaci.

273.    As a direct and proximate result of Defendants' negligence, Ms. Capaci suffered extraordinary conscious pain and suffering, emotional distress, fear of impending death, economic damages, catastrophic injuries, and other damages, both general and special.

274.    As a direct and proximate result of Defendants' negligence, Ms. Capaci sustained damages in an amount to be determined at trial.

275.    Plaintiff also demands punitive damages as to this Cause of Action.

276.    Defendant's gross negligence, carelessness, and recklessness in their refusal to provide urgent and necessary medical care constitutes a willful or malicious disregard of Ms.

Capaci's welfare, which justifies an award of punitive damages.

### FIFTH CAUSE OF ACTION
### (Negligence)
### (Against Defendants County and CO Dasraj)

277.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

278.    At all relevant times, Defendant CO Dasraj and other correctional personnel involved in Ms. Capaci's care and supervision were employed by Defendant County, to render custodial care at OCCF in that capacity.

279.    It was the duty of Defendants County and its agents, servants, contractors, and/or employees to ensure that detainees at OCCF are given adequate supervision and monitoring.

280.    Defendants breached this duty by failing to appropriately monitor, supervise, observe, and care for Ms. Capaci throughout the time that she was in the housing unit and/or jail cell.

281.    Despite the Special Watch protocol in effect, Defendants failed to consistently monitor Ms. Capaci's physical condition or signs of distress.

282.    Defendants also failed to immediately call for medical attention when Ms. Capaci exhibited signs of severe opiate withdrawal, sometimes mocking or dismissing her complaint.

283.    During the four hours leading up to her death, Ms. Capaci appears to have languished in her jail cell with no care, supervision, or monitoring. Given the dire physical condition she was in at the last Medical Department visit, this neglect amounted to reckless abandonment of a ward in custody.

284.    At all relevant times, each of the Defendants stood in such a relationship with the other Defendants in their care and treatment of Ms. Capaci as to make each of the Defendants

liable for the acts and omissions of all other Defendants with regard to their care, diagnosis, and treatment rendered to Ms. Capaci, or lack thereof.

285.    Defendant County of Orange is liable for the negligence of its agents, servants, contractors, and employees including but not limited to Defendant CO Dasraj under the doctrine of *respondeat superior*.

286.    Ms. Capaci's injuries were inflicted solely through the negligence of the Defendants, and through no fault or want of care or negligence or contributory negligence on the part of Ms. Capaci.

287.    Defendants' conduct constituted the tort of negligence in the State of New York.

288.    This action falls within one or more of the exceptions set forth in CPLR § 1602, and as such, the Defendants are jointly and severally liable pursuant to the exceptions set for in Article 16 of the CPLR.

289.    Pursuant to CPLR § 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiff's damages, including but not limited to her non-economic loss, by reason of the fact that Defendants' liability arose by reason of a non-delegable duty of care owed to Ms. Capaci and/or by reason of the doctrine of *respondeat superior*.

290.    Pursuant to CPLR § 1602(7), Defendants are jointly and severally liable for all of the Plaintiff's damages, including but not limited to her non-economic loss, by reason of the fact that Defendants acted in such a reckless manner as to completely disregard the consequences of their actions on the safety of others including Ms. Capaci.

291.    As a direct and proximate result of Defendants' negligence, Ms. Capaci suffered extraordinary conscious pain and suffering, emotional distress, fear of impending death, economic damages, catastrophic injuries, and other damages, both general and special.

292.     As a direct and proximate result of Defendants' negligence, Ms. Capaci sustained damages in an amount to be determined at trial.

293.     Plaintiff also demands punitive damages as to this Cause of Action.

294.     Defendant's gross negligence, carelessness, and recklessness in their refusal to provide urgent and necessary medical care constitutes a willful or malicious disregard of Ms. Capaci's welfare, which justifies an award of punitive damages.

### SIXTH CAUSE OF ACTION
### (Negligent Hiring, Training, and Supervision)
### (Against Defendants County, Wellpath, LLC, and New York Correct Care Solutions Medical Services, P.C.)

295.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

296.     At all relevant times, it was the duty of the County of Orange to hire, train, and supervise its agents, servants, contractors, and/or employees to operate, maintain, and manage OCCF and its various facilities including the Medical Department, and to protect the health and safety of the detainees within.

297.     Defendant County was negligent in hiring, training, and supervising correctional and medical personnel including but not limited to Defendant CO Dasraj and Defendant Nurse Washington, who were careless, reckless, unskillful, negligent, and who did not possess the requisite knowledge and skill of professionals in the community.

298.     Upon information and belief, Defendant County failed to use reasonable care in the hiring, training, and supervision of correctional and medical personnel including but not limited to Defendant CO Dasraj and Defendant Nurse Washington, who were on duty and acting within the scope of their employment when they rendered careless, reckless, unskillful, and negligent care and/or supervision to Ms. Capaci.

299. Defendant County's conduct constitutes the tort of negligence under the laws of the State of New York.

300. At all relevant times, it was the duty of Defendants Wellpath, LLC and/or New York Correct Care Solutions Medical Services, P.C. (collectively "Defendant Wellpath") to hire, train, and supervise its agents, servants, and/or employees to operate, maintain, monitor, and manage detainees requiring medical care at OCCF and its various facilities including the Medical Department, and to protect the health and safety of the detainees within.

301. Defendant Wellpath was negligent in hiring, training, and supervising medical personnel including but not limited to Defendant Nurse Washington, who were careless, reckless, unskillful, negligent, and who did not possess the requisite knowledge and skill of medical professionals in the community.

302. Upon information and belief, Defendant Wellpath failed to use reasonable care in the hiring, training, and supervision of medical personnel including but not limited to Defendant Nurse Washington, who were on duty and acting within the scope of their employment when they rendered careless, reckless, unskillful, and negligent care and/or treatment to Ms. Capaci.

303. Defendant Wellpath's conduct constitutes the tort of negligence under the laws of the State of New York.

304. As a direct and proximate result of this negligence, Ms. Capaci suffered extraordinary conscious pain and suffering, emotional distress, fear of impending death, economic damages, catastrophic injuries, and other damages, both general and special.

305. As a direct and proximate result of this negligence, Ms. Capaci sustained damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Wrongful Death)
### (Against All Defendants)

306.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

307.    As described more fully in the preceding paragraphs, Ms. Capaci died at 40 years of age while in the custody of OCCF because of fatal, mismanaged opiate withdrawal. Her pleas for medical attention and proper detoxification went ignored by the Defendants. She was found dead on the floor of her cell at around 6am on May 6, 2023—just three days after she walked into OCCF as a relatively healthy woman, loved by her family.

308.    Ms. Capaci is survived by seven young children: her 25-year-old daughter Aryana Davila, 23-year-old daughter Loreli Davila, 22-year-old daughter Maya Davila, 20-year-old son Jaeden Davila, 13-year-old daughter A.S., 13-year-old daughter S.S., and 9-year-old son N.S. She is also survived by her sister, Plaintiff Layla Capaci, her brother Benjamin Capaci, her mother Carolyn Morse, and her father Salvatore Capaci.

309.    Each of Ms. Capaci's next-of-kin, including her seven children, were entitled to Ms. Capaci's services, society, comfort, guidance, contact, companionship, advice, counsel, love, affection, and support. By reason of Defendants' unconstitutional and otherwise unlawful conduct, each of Ms. Capaci's next-of-kin, including her seven children, were deprived of Ms. Capaci's services, society, comfort, guidance, contact, companionship, advice, counsel, love, affection, and support (both financial and non-financial), and suffered injuries, losses, harm, and damages, both general and special.

310.    Plaintiff Layla Capaci, as Administrator to the Estate of Niki Capaci, brings this action for the damages that would have otherwise been recoverable by Ms. Capaci had she been

alive, and for the damages caused to Ms. Capaci's next-of-kin by her wrongful death.

311.    Plaintiff Layla Capaci, on behalf of all surviving distributees and next of kin, including Aryana Davila, Loreli Davila, Maya Davila, Jaeden Davila, A.S., S.S., and N.S., claims damages for the wrongful death of Ms. Capaci, including for their injuries, mental anguish, pecuniary and non-pecuniary losses, and loss of Ms. Capaci's services, society, comfort, guidance, contact, companionship, advice, counsel, love, affection, and support, both past and future, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgement be entered against Defendants as follows:

a.  An award of compensatory damages for personal injuries, pain and suffering, emotional distress, wrongful death, economic damages, both general and special, and other harm, in an amount to be determined at trial;

b.  An award of punitive damages for the First through Fifth Causes of Action, in an amount to be determined at trial;

c.  An award of pre- and post-judgement interest as permitted by law, for any and all monetary and/or non-monetary losses;

d.  An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

e.  Such other and further relief at law or in equity as this Court may deem just and proper.

Dated: New York, New York
        August 1, 2025

By: _____
    Jaehyun Oh
    The Jacob D. Fuchsberg Law Firm, LLP
    *Attorney for Plaintiff*
    3 Park Avenue, Suite 3700

New York, New York 10016
(212) 869-3500, Ext. 245
j.oh@fuchsberg.com

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAYLA CAPACI, as Administrator of the Estate of Niki Capaci, Deceased, and on behalf of All Distributees and Next-of-Kin including LAYLA CAPACI, Individually, | Civil Action No.: 7:24-cv-4626 (PMH) |
| Plaintiff, | |
| -against- | **CERTIFICATE OF MERIT** |
| CYREL DASRAJ, COUNTY OF ORANGE, TENESHIA WASHINGTON, RN, WELLPATH, LLC as a Nominal Defendant, WELLPATH LIQUIDATING TRUST as a Nominal Defendant, NEW YORK CORRECT CARE SOLUTIONS MEDICAL SERVICES, P.C., and JOHN and JANE DOE #1-10, | |
| Defendants. | |

JAEHYUN OH, the undersigned, an attorney duly admitted to practice in the Courts of New York State, states that she is a partner of the Jacob D. Fuchsberg Law Firm, LLP, attorneys for the Plaintiff in the within action. She has reviewed the facts of this case and has consulted with at least one physician who is licensed to practice in this State or any other state and whom she reasonably believes is knowledgeable in the relevant issues involved in this action, and she has concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

Dated: New York, New York
        August 1, 2025

By: _____
    Jaehyun Oh
    The Jacob D. Fuchsberg Law Firm, LLP
    *Attorneys for Plaintiff*
    3 Park Avenue, Suite 3700
    New York, New York 10016